The **METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Plaintiff,**

v.

**UNITED STATES of America DEPARTMENT OF THE NAVY, etc., Defendant.**

No. 88 C 5407.

United States District Court, N.D. Illinois, E.D.

Sept. 21, 1989.

---

Paul D. Lindauer, Jr. and Allen S. Lavin, The Metropolitan Sanitary Dist. of Greater Chicago, Chicago, Ill., for plaintiff.

James J. Kubik, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Metropolitan Sanitary District of Greater Chicago (MSD) brings this action against the United States Department of the Navy (government) alleging a failure to comply with the terms and conditions of a sewer discharge permit. We have before us the government's motion to dismiss the entire case for want of subject matter jurisdiction and a separate motion to dismiss count III. For the following reasons, we deny the government's motion to dismiss.

### FACTS

The MSD is a unit of Illinois local government and has authority over discharges to its sewer system. Under a permit issued by the MSD, the government's sewage system at the Glenview Naval Air Station discharges into the MSD's sewer system. The MSD filed this action against the United States Department of the Navy alleging that the naval station has failed to comply with the terms and conditions of the permit. In count I, the complaint asks that this court issue a writ of mandamus ordering the government to comply with the terms of the discharge permit. In count II, the MSD asks for an injunction barring further discharges until the government complies with the terms of the discharge permit. And in count III, the MSD asks for civil penalties of $100 to $1,000 for each day that the government has discharged sewage in violation of the terms of the permit. The MSD asserts that this court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2), and under § 313 of the Clean Water Act, 33 U.S.C. § 1323.

The government moves to dismiss for want of subject matter jurisdiction, arguing that the MSD failed to follow the procedures outlined in § 505 of the Clean Water Act, 33 U.S.C. § 1365 (1982 & Supp. V 1987), that are necessary prerequisites before citizens may sue to enforce the Act. The government further challenges count III, arguing that the Act's waiver of sovereign immunity is not broad enough to permit suits that seek civil penalties against the United States.

### DISCUSSION

#### I. *Subject Matter Jurisdiction*

Section 505(a) of the Clean Water Act permits citizens to sue any person, including the United States, in federal district court to enforce the Act. 33 U.S.C. § 1365(a). Citizens may sue any defendant who is alleged to violate an effluent standard or any order concerning such a standard, when that order is issued by a state or the administrator of the Environmental Protection Agency (EPA). *Id.* The Act specifies, however, that at least sixty days before filing such a suit the citizen-plaintiff must provide notice to the EPA's administrator, to the state where the alleged violation of the Act occurs, and to the alleged violator. 33 U.S.C. § 1365(b). The government asserts that the MSD has failed to provide the EPA with notice of this suit and that the suit should therefore be dismissed for failure to meet the Act's jurisdictional prerequisites for a citizen suit.

 Because the government misconstrues the MSD's complaint, the government's argument misses the mark. This action is *not* framed as a citizen suit under § 505 of the Clean Water Act. The MSD thus has no obligation to comply with the notice requirements for a citizen suit. The government's motion to dismiss all three counts of this suit is therefore denied.

 Disposal of the notice question, however, does not end this court's inquiry

into its subject matter jurisdiction. The MSD invokes the general federal question jurisdiction of this court under 28 U.S.C. § 1331. Under Illinois law the MSD has authority to issue permits allowing discharge into its sewers, to set the conditions under which that discharge is permitted and to enforce those conditions in court by seeking injunctions, writs of mandamus and civil penalties. *See* Ill.Rev.Stat. ch. 42 ¶ 326f (1987 and Supp.1988). The question of federal law arises from § 313(a) of the Clean Water Act, 33 U.S.C. § 1323(a), which mandates that federal facilities comply with all requirements of federal, state and local law regarding the control and abatement of water pollution,[1] and which also subjects federal facilities to the same enforcement procedures, including process and sanctions, to which private entities are subject. The MSD has properly invoked this court's jurisdiction under 28 U.S.C. § 1331.

## II. *Sovereign Immunity*

We now turn to the government's argument that count III should be dismissed because civil penalties cannot be imposed against the United States for violating state water pollution standards. In reply to the government's motion to dismiss, the MSD offers various arguments suggesting that the United States has either waived the defense of sovereign immunity or is otherwise estopped to raise the defense.

■ The MSD's assertions of waiver and/or estoppel do nothing to combat the government's claim of sovereign immunity. Only an Act of Congress can validly waive the sovereign immunity of the United States. *Willis v. United States*, 600 F.Supp. 1407, 1411 (N.D.Ill.1985). *See* Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3654.

■ In a suit against the United States the jurisdictional allegations in the plaintiff's complaint must refer to a statute that waives the government's immunity. *Id.* Civil § 1212. In this case the MSD's complaint includes reference to § 313 of the

Clean Water Act, 33 U.S.C. § 1323(a). The government asserts that this statute does not represent congressional consent to suits that seek civil penalties. This court disagrees.

Section 1323(a) begins with a broad waiver of the government's immunity:

> Each department, agency or instrumentality of ... the Federal Government ... and each officer, agent, or employee thereof, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.

33 U.S.C. § 1323(a).

The government contends that because § 1323(a) does not expressly consent to suits for "civil penalties," the subsection's waiver of sovereign immunity cannot be construed to extend to civil penalties. The government argues that waivers of sovereign immunity are read especially narrowly when litigants seek penalties against the United States. The government cites *Missouri Pacific Railroad v. Ault*, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921), where the Court interpreted the Federal Control Act, a statute that provided for federal operation of some railroads during the First World War. Section 10 of the

---

**1.** The government appears to agree that the terms and conditions of the Navy's discharge permit are requirements respecting the control and abatement of water pollution.

Control Act provided that "carriers while under Federal control shall be subject to all laws and disabilities as common carriers, whether arising under State or Federal laws or at common law." *Id.* at 554, 41 S.Ct. at 594. The Court there held that this seemingly broad waiver of sovereign immunity did not subject a federal carrier to penalties authorized by state statute. In the Court's view, the Control Act obligated the government to compensate people who suffered injury that arose when a government employee violated duties established by law, even state law, but the government remained immune from fines and penalties:

> [Congress] did not undertake to punish itself for any departure by the imposition upon itself of fines and penalties or to permit any other sovereignty to punish it. Congress is not to be assumed to have adopted the method of fines paid out of public funds to insure obedience to the law on the part of the Government's railway employees.

*Id.* at 563–64, 41 S.Ct. at 597.

This court believes that the government's reliance on *Ault* is inappropriate in this case, because the statute that the Court construed in Ault is distinguishable from the Clean Water Act. In *Ault,* the Court based its decision on the premise that Congress permitted suit against government-operated railroads only for the purpose of compensating injured parties, not for the purpose of punishment. "The purpose for which the Government permitted itself to be sued was compensation, not punishment." 256 U.S. at 564, 41 S.Ct. at 597. Having determined the purpose behind the Control Act's seemingly all-encompassing waiver of sovereign immunity, the *Ault* Court limited the waiver to that purpose: compensation only.

2. We note that Congress did not irrevocably subject federal facilities to the regulations of the states. A portion of § 1323(a) not quoted above authorizes the President to exempt federal facilities from their duty to comply with water pollution regulations.

3. In concluding that § 313 of the Clean Water Act did not waive the government's immunity from suit for civil penalties, the *McClellan* court relied largely on its analysis of somewhat sim-

■ The congressional purpose behind the Clean Water Act and the 1977 Amendments, however, is not so narrow. Congress passed the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act set a national goal that the discharge of pollutants into the nation's navigable waters be entirely eliminated by 1985. *Id.* The legislation's purpose was to achieve compliance with new standards, not to simply compensate for injuries caused by existing practices. Congress intended to actually change existing practices. Congress clearly planned to coerce polluters by providing that injunctions and sanctions were among the federal and state enforcement mechanisms to which all polluters, including federal facilities, must submit. Subjecting federal facilities to sanctions, including penalties for violations as well as fines for violating injunctions, is entirely consistent with the congressional purpose behind the Clean Water Act.[2] In view of the Act's purpose, we find no special reason to adopt an artificially narrow construction of the language of § 1323(a)'s waiver of sovereign immunity. We turn now to the task of interpreting that language.

■ Although § 1323(a) does not expressly consent to suits asking for "civil penalties," the statute does say that federal facilities shall be subject to *all* requirements, whether substantive, procedural or "any other requirement whatsoever." Some courts interpret the term "requirements" to include civil penalties. *See, e.g., Main v. Department of Navy,* 702 F.Supp. 322, 328 (D.Me.1988). Others have disagreed. *See, e.g., McClellan Ecological Seepage Situation v. Weinberger,* 655 F.Supp. 601, 604 (E.D.Cal.1986).[3] Even if

ilar language in § 6001 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6961. The waiver of sovereign immunity in that statute provides:

> Each department, agency, and instrumentality of ... the Federal Government ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural (including any requirement for permits or reporting or any provisions or injunctive relief and such sanc-

civil penalties are not included in the term "requirements," they are surely included in the statute's provision that federal facilities shall be subject to "all ... sanctions respecting the control and abatement of water pollution." Although the government asserts that "sanctions" refers only to sanctions imposed for violating a court order, we do not adopt such a narrow construction of the statute's language. *Cf. Parola v. Weinberger*, 848 F.2d 956, 962 n. 3 (9th Cir., 1988) (regarding identical provision of the Clean Air Act as a waiver of sovereign immunity from suits seeking civil penalties). This court concludes that the first three sentences of § 1323(a) communicate a clear congressional intent to provide a sweeping waiver of sovereign immunity that renders federal facilities just as liable and just as answerable to water pollution laws—including laws providing for civil penalties—as any private entity.

The legislative history of § 1323(a) further supports the conclusion that Congress intended the language of the section's first sentence to serve as a blanket waiver of sovereign immunity that would include a state's entire scheme for enforcing water pollution regulations, including civil penalties. The current wording of § 1323(a) became law in the 1977 Amendments to the Clean Water Act. Congress amended the Clean Water Act, as well as the Clean Air Act and the Safe Drinking Water Act, in response to the Supreme Court's decisions in *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) and *EPA v. California*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). In these cases the Court considered the extent to which federal facilities were subject to state control under the then current language of the Clean Air Act and the Federal Water Pollu-

tion Control Act (now the Clean Water Act). Both statutes simply bound federal facilities to comply with "all Federal, State, and local requirements" regarding air and water pollution to the same extent as private entities. The Court held that this language required federal facilities to comply with the substantive requirements of state law, such as specific limits on discharges of pollutants, but did not require federal facilities to comply with state regulations that required operating permits. The Court distinguished between the substantive requirements of state law, to which federal facilities were clearly subject, and procedural requirements of state law, which in the Court's view did not bind federal facilities under the language of the applicable statutes. The Court distinguished the substantive requirements of state law from the mechanisms that states employed to enforce those substantive requirements. Given that Congress established for federal facilities the duty to comply with state emission standards, the Court asked whether Congress also intended that states could employ the enforcement mechanisms of their federally-approved pollution control plans. *Hancock*, 426 U.S. at 183, 96 S.Ct. at 2014. The Court characterized the issue as "whether a State may enforce its emission limitations against a federal installation." *Id.* at 184 n. 44, 96 S.Ct. at 2015 n. 44. Although the Court answered that question in the negative, the *Hancock* opinion suggested that Congress could produce a different result by merely rewriting the statute with the stipulation that federal facilities would be subject to *all* requirements of state pollution laws. 426 U.S. at 182, 96 S.Ct. at 20.

tions as may be imposed by a court to enforce such relief), respecting control and abatement of solid waste or hazardous waster disposal in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges. Neither the United States, nor any agent, employee, or officer thereof, shall be immune or exempt from any process or sanction of any State or Federal Court with respect to the enforcement of any such injunctive relief.

42 U.S.C. § 6961. The wording of the RCRA differs from the Clean Water Act and a conclusion that the former does not permit civil penalties should not automatically be applied to the latter statute. The only "sanctions" that RCRA mentions are sanctions imposed to enforce an injunction; the Clean Water Act includes "any ... sanction." *Cf. Parola v. Weinberger*, 848 F.2d 956, 962 n. 3 (9th Cir.1988).

■ Congress rewrote several pollution statutes the following year. The 1977 Amendments, which share similar wording,[4] were intended to reverse the outcome of the Supreme Court's 1976 holding that states were powerless to enforce their pollution laws against federal facilities. As the Supreme Court suggested, Congress specified that federal facilities must comply with *all* requirements regarding pollution control. Congress also added a clarifying sentence, now the second sentence of § 1323(a), explaining that "all" requirements includes substantive, procedural, "and any other requirement whatsoever." In addition, the 1977 Amendments expressly subject federal facilities not only to state administrative authority but also to state process and state sanctions. The clarifying sentence in § 1323(a) adds that the statute applies to "any" process and sanction. With the third sentence in the amended version of § 1323(a) Congress reiterated that no claim of any immunity, including sovereign immunity, should interfere with the application of pollution laws to federal facilities. In the legislative history to the Clean Water Act Amendments of 1977, the Senate Environment and Public Works Committee wrote that the amended version of § 1323(a) "indicate[s] unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws." S.Rep. No. 95–370, 95th Cong., 1st Sess. 67, *reprinted in* 1977 U.S.Code Cong. & Admin.News 4326, 4392. Although the Senate Committee did not expressly mention civil penalties, this court believes that such sanctions are included in the Committee's emphatic statement that federal facilities are subject to "all of the provisions" of state and local pollution regulations.

### The Limitation on the Waiver

When drafting the 1977 amendments to the waivers of sovereign immunity in the Clean Air Act, the Clean Water Act and the Safe Drinking Water Act, Congress provided that federal officials would not be personally liable for any civil penalties. In the Clean Water Act, but not in the other statutes, Congress also added a further limitation on the waiver of sovereign immunity:

[T]he United States shall be liable only for those civil penalties arising under Federal law or imposed by a State or

**4.** Section 118 of the Clean Air Act provides: Each department, agency or instrumentality of ... the Federal Government ... and each officer, agent, or employee thereof, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of air pollution in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanctions, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. No officer, agent, or employee of the United States shall be personally liable for any civil penalty for which he is not otherwise liable.

42 U.S.C. § 7418(a), as amended by Act of Aug. 7, 1977, Pub.L. 95–96, Title I, § 116(a), 91 Stat. 711.

The Safe Drinking Water Act provides:

Each Federal agency ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authorities, and process and sanctions respecting the provision of safe drinking water and respecting any underground injection program in the same manner, and to the same extent as any nongovernmental entity. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply, notwithstanding any immunity of such agencies, under any law or rule of law. No officer, agent, or employee of the United States shall be personally liable for any civil penalty under this subchapter with respect to any act of omission within the scope of his official duties.

42 U.S.C. § 300j–6(a), as amended by § 8(a) of the Safe Drinking Water Amendments of 1977, enacted Nov. 16, 1977, Pub.L. 95–190, 91 Stat. 1393.

local court to enforce an order or the process of such court.

33 U.S.C. § 1323(a). This limitation of federal liability provides further reason to conclude that the first three sentences of § 1323(a) waive the government's immunity from suit for civil penalties. In all three statutes Congress first laid out a broad waiver of sovereign immunity and then added a limitation to protect the personal finances of federal employees. In the Clean Water Act, the additional qualification limits the government's waiver of sovereign immunity so that the United States is liable for some, but not all, civil penalties. As Judge Carter concluded, the qualification of sovereign immunity that is unique to the Clean Water Act

> carve[d] out of the generic categories of civil penalties previously imposed those civil penalties which did not arise under federal law or which were not imposed by a local court order for enforcement purposes. The provision exempts the United States from liability for those civil penalties, and leaves the residue of the generic category of civil penalties (*e.g.*, those that arise under federal law or which were imposed by a state or local court) to be borne by the United States.

*Maine v. Department of the Navy*, 702 F.Supp. 322, 329 (D.Me.1988). *See also Ohio v. United States Dept. of Energy*, 689 F.Supp. 760, 765–67 (S.D.Ohio 1988). This court thus concludes that the United States has waived its immunity to suits seeking civil penalties as long as those penalties arise under federal law.

The next question, then, is whether the penalties the MSD seeks are penalties that arise under federal law. One court has concluded that when a state seeks penalties for violations of standards formulated or permits issued under a state-operated EPA-approved program under the National Pollutant Discharge Elimination System (NPDES), the penalties do arise under federal law and the United States has waived its sovereign immunity. *See Ohio v. United States Dept. of Energy*, 689 F.Supp. 760, 766–67 (S.D.Ohio 1988). In this case the MSD has not asserted that the government is violating the terms of an NPDES permit and it does not appear that the Glenview Naval Air Station's permit to discharge sewage into the MSD system is a permit issued under the state-operated program that implements the NPDES. In replying to the government's motion to dismiss, the MSD raises another point that may suggest that the MSD has other grounds for arguing that the penalties it seeks arise under federal law. The MSD operates its Northside Treatment Plant under an NPDES permit issued by the EPA. As a condition of that permit, the MSD asserts, the MSD is bound to "vigorously enforce" the conditions attached to the Navy's discharge permit. The MSD has portrayed itself as being forced by the federal government, in the form of the EPA, to sue the federal government, in the form of the Navy.

■ It may well be that the claim for civil penalties does not arise under federal law. The MSD has not argued that federal law requires it to seek civil penalties in addition to an injunction, nor has the MSD otherwise asserted that the penalties sought "arise under federal law" as that phrase is used in 33 U.S.C. § 1323(a). We cannot decide that question, however, by a motion to dismiss, since the MSD may be able to show that it is pursuing federally-sanctioned penalties. The government's motion to dismiss count III is, at least for now, denied.

## CONCLUSION

For the foregoing reasons, the government's motions to dismiss are denied.